1

2

3

4

5

6                 IN THE UNITED STATES DISTRICT COURT FOR THE

7                      EASTERN DISTRICT OF CALIFORNIA

8

9   WAYNE BILLINGSLEY, WAVA        )        No. CV-F-02-5853 REC DLB
    BILLINGSLEY AND CALIFORNIA     )
10  AGRI SPRAYERS, INC., a         )        ORDER DENYING DEFENDANT'S
    California Corporation,        )        MOTION FOR SUMMARY
11                                 )        JUDGMENT. (Doc. 29)
                     Plaintiffs,   )
12                                 )
              vs.                  )
13                                 )
    LOVELAND INDUSTRIES, INC.      )
14  dba UAP WEST, a Colorado       )
    Corporation, and Does 1        )
15  through 50 inclusive,          )
                                   )
16                   Defendants.   )
                                   )
17  _____)

18       On November 8, 2004, the Court heard oral argument regarding

19  Defendant UAP's ("UAP") Motion for Summary Judgment.  On January

20  11, 2005, the Court received the last of the supplemental filings

21  it permitted.  Upon due consideration of the written and oral

22  arguments of the parties and the record herein, the Court denies

23  Defendant's motion for summary judgment as set forth below.

24  **I.   Factual Background**

25       Plaintiffs Wayne Billingsley, Wava Billingsley and

26  California Agri Sprayers, Inc. (collectively, "Plaintiffs") are

                                  1

the owners and operators of an almond orchard located in Tulare
County ("the subject orchard").  Defendant Loveland Industries'
dba UAP West ("UAP") is a supplier of agricultural fertilizers.

The subject orchard consists of approximately 80 acres and
is located on the northwest corner of APN 338-070-066 (1/2 mile
w/o Rd. 176 and Ave. 8).  The almond trees on the property were
planted in or about 1976 or 1977, making them approximately 24
years old at the time of the alleged incident.  Mr. Dudley Steele
has been employed by Plaintiffs for approximately 15 years and is
the farm manager and representative for Plaintiffs for the
subject orchard.

UAP is an agricultural chemical company that supplies
fertilizer to farms and orchards in California.  It is common
practice for fertilizer companies to provide orchard owners with
fertilizer "rinsate."  Rinsate is water that contains trace
amounts of fertilizer resulting from the capture of water used to
rinse fertilizer transport tanks.  Rinsate contains between one
and one and one-half percent nitrogen and generally provides
trace amounts of supplemental nutrition to an orchard's soil.

Fred Valov is a licensed Pest Control Advisor ("PCA") and
former UAP salesman who has been employed by various agricultural
companies.  Mr. Valov was Mr. Steele's primary PCA for the
orchards managed by Mr. Steele.

In the early spring of 1999, while employed by UAP, Mr.
Valov approached Mr. Steele about UAP supplying rinsate to the
subject orchard.  At that time, Plaintiffs had an existing

2

agreement with Simplot, Mr. Valov's former employer, to supply
rinsate to the subject orchard by depositing it directly into the
subject orchard's irrigation reservoir (sump).  The agreement
with Simplot had existed at least during the prior two years.
Mr. Steele verbally agreed with Mr. Valov to an arrangement on
behalf of Plaintiffs.  UAP subsequently placed a tank on the
subject orchard next to the irrigation sump to store rinsate.
Depending on the volume of rinsate it produced UAP would
periodically deposit rinsate into the tank.  There is a dispute
as to whether UAP deposited anything other than rinsate at the
subject orchard.

Mr. Valov left UAP's employ in November of 2000.  Mr. Steele
did not contact anyone at UAP to terminate the agreement.  The
rinsate tank remained in the subject orchard and UAP continued to
occasionally deposit rinsate there.

The subject orchard was irrigated in the spring of 2001.
After this irrigation, the almond trees in the orchard suffered
extensive damage.  Mr. Steele contacted Mr. Valov who in turn
contacted UAP.  UAP responded and performed an investigation.
Mr. Steele also contacted the California Department of Toxic
Substances Control ("DTSC") claiming that chemical contamination
had occurred.  On February 20, 2002, DTSC inspected the subject
orchard and took water samples from the sump.  The DTSC results
indicated that, at least at the time the samples were taken,
there were no hazardous materials in the sump.  DTSC submitted
the sample results to Mr. Harry Andrus, an Agriculture Consultant

1  with the University of California extension, for analysis of the

2  possible effects of the constituents in the results on almond

3  trees.  Mr. Andrus informed DTSC that the irrigation panel did

4  not indicate that there was anything present in the irrigation

5  sump that would damage almond trees.

6      The subject orchard consists of approximately 8,000 trees.[1]

7  Plaintiffs dispute UAP's expert's assertion that, after the

8  incident, approximately 58 almond trees were dead and 97 more

9  trees appeared to have 25% to 50% damage, but Plaintiffs offer no

10  alternative estimate.  It appears undisputed that in April of

11  2001 at least some of the trees were damaged and/or dead.

12  **II.  Procedural History**

13      Plaintiffs filed a Complaint in the Superior Court of

14  California in Tulare County on June 12, 2002, against UAP and Doe

15  Defendants, alleging a single cause of action for trespass.

16  Plaintiffs allege that in November 2000 and continuing

17  thereafter, UAP trespassed on Plaintiffs' property and dumped

18  unknown but allegedly hazardous chemicals into the subject

19  orchard's reservoir/irrigation sump.  Plaintiffs allege that upon

20  subsequent irrigation these unknown chemicals caused the almond

21  trees in the subject orchard to die and that the subject

22  orchard's soil is damaged to an unknown extent.

23      UAP removed the action to federal court based on diversity

24

25      [1] UAP's moving papers indicate that the subject orchard had
26  80,000 trees, but in the declaration of Dr. Dale Rush, UAP's
   expert, he states that the orchard had only 8,000 trees.

4

on July 15, 2002.  Plaintiffs added J.R. Simplot Company ("Simplot") as a Defendant on June 19, 2003.  The Court approved Simplot's motion for good faith settlement determination and Plaintiffs stipulated the dismissal of Simplot from this action.

UAP filed its motion for summary judgment and statement of undisputed material facts ("UMF") on May 4, 2004.  Plaintiffs filed three oppositions that were based on a need for further discovery.  On November 3 and November 4, 2004, Plaintiffs filed a memorandum of points and authorities[2] and a statement of disputed facts.

At oral argument, it became apparent that UAP had not received Plaintiffs' late filings.  The Court issued an order granting UAP time to respond.  The Court also granted Plaintiffs time to respond and ordered Plaintiffs to "offer specific proof regarding results of expert tests conducted at the orchard that contradict the declaration and testimony of UAP's expert, Dr. Dale Rush."

On December 8, 2004, UAP filed its supplemental response to Plaintiffs' substantive opposition.  In response to the Court's mandate Plaintiffs then filed a declaration by Mr. Valov, the former UAP employee and the Pest Control Advisor (PCA) for the subject orchard for approximately the last 12 years.  UAP filed evidentiary objections to Mr. Valov's declaration.

---

[2] Plaintiffs' "points and authorities" is devoid of legal citation and would more properly, and conveniently, have been included in Plaintiffs' statement of disputed facts.

5

III.  Discussion

A.  Legal Standard

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.   A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Materiality is determined by the substantive law governing a claim or a defense.  Id.  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  Id.

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  T.W. Elec., 809 F.2d at 630.

The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific

1  facts showing there is a genuine issue for trial." Id. (citing

2  Fed. R. Civ. P. 56(e)).  The nonmoving party may not simply state

3  that it will discredit the moving party's evidence at trial; it

4  must produce at least some "significant probative evidence

5  tending to support the complaint." Id. (citing First Nat'l Bank

6  v. Cities Serv. Co., 391 U.S. 253, 290, 88 S. Ct. 1575, 20 L. Ed.

7  2d 569 (1968)).

8  **B.  Trespass**

9  **1.  Entry**

10  To succeed on a claim for trespass, Plaintiffs will have to

11  demonstrate an "unauthorized entry" onto Plaintiffs' property.

12  Such entry is the "essence of the cause of action for trespass."

13  Miller v. NBC, 187 Cal. App. 3d 1463, 1480 (1986).  If there is a

14  consensual entry there is no tort because lack of consent is an

15  element of the claim.  Id.

16  If a party is granted permission to enter property subject

17  to a specific condition or for a specific use and the party

18  exceeds the scope of that permission, then the entry becomes

19  unauthorized.  Intel Corp. v. Hamidi, 30 Cal. 4th 1342, 1377

20  (2003) (discussing Mendelson v. McCabe, 144 Cal. 230 (1904)).

21  Whether UAP trespassed on Plaintiffs' property depends on whether

22  UAP had consent and, if so, whether UAP exceeded the scope of

23  that consent.

24  **a) UAP's Consent to Enter the Subject Orchard**

25  UAP argues that it had consent to enter Plaintiffs' property

26  and that this consent was never revoked.  It is undisputed that,

7

1  at least at some point in time, UAP had permission to enter the

2  subject orchard to deposit rinsate into the tank pursuant to the

3  agreement made in 1999 between Mr. Steele and Mr. Valov.  It is

4  also undisputed that Mr. Steele did not contact UAP to terminate

5  the agreement.  These undisputed facts are sufficient at this

6  time to carry UAP's initial burden of demonstrating that it had

7  consent to enter the property.

8  **b) The Scope of Consent Granted**

9  The scope of UAP's consent depends upon the terms of the

10 agreement.  Mr. Valov avers that he is personally aware of the

11 agreement between UAP and Mr. Steele regarding the rinsate.

12 Valov Decl. at ¶ 15.  The agreement was that UAP would place a

13 5,000 gallon storage tank at the reservoir, only rinsate would be

14 placed in the tank, no rinsate would be put directly into the

15 reservoir, and that Mr. Bilbrey was to monitor the rinsate in the

16 tank and "calibrate and control" the amount of rinsate that went

17 into the reservoir.  Id.

18 UAP objects to this information as hearsay and lacking

19 foundation.  UAP argues that Mr. Valov testified "that he had no

20 specific conversations with anybody at UAP about the specifics of

21 the alleged rinsate agreement between UAP and Mr. Steele."

22 Def.'s Objections to Valov Decl. at 2.  The testimony cited is as

23 follows:

24    Q.  Okay.  I don't want to put words in your mouth.
      When you left [UAP] on November 10th [2000], what was

25    your understanding of the disposition of the
      arrangement between UAP and Mr. Steele, the rinsate

26    arrangement?

8

1    A.  Well, Mr. Landrigan made the comment to Mr. Bilbrey
when I left that he started - had Danny put a list
2    together to bring all this equipment in, because he
made the comment that, "You brought the business,
3    you're talking [taking?] the business."  Meaning
they're not going - they're not going to have the
4    business.  And we also had that tank marked down to
bring in.  And so, to us, obviously, we're taking all
5    your equipment off your ranches or our clients that
that terminates the association with it and -

6

7    Q.  So are you saying that it was your understanding
that the agreement between UAP and Mr. Steele was
terminated at the moment you terminated your employ?

8

9    A.  And/or Dan.

10    Q.  And/or Danny?

11    A.  Because Dan was part of the equation.

12    Q.  Did you have any specific conversations with Mr.
Cannella about the status of the arrangement?

13    A.  I never did when we set it up, and I didn't when I
14    left.

15    Q.  But, needless to say, you had a very clear
understanding, in your own mind, that with you leaving
16    UAP, the arrangement between UAP and Mr. Steele
regarding rinsate would be terminated?

17    A.  Yeah.  And Mr. Landrigan supported that by - with
the equipment, taking it all off.  He said they brought
18    the business, they're going to take the business.
Yeah.  We had assumed that then we tell you to come
19    take the tank that that contract was null and void.

20  Valov Depo. 124:14-25, 125:1-12.

21    This objection is overruled.  To the extent UAP is arguing

22  that Mr. Valov lacked knowledge of the agreement after his

23  termination with UAP, there is no evidence that UAP renegotiated

24  the agreement with Mr. Steele.  The only agreement apparently

25  ever in place was the one that was negotiated by Mr. Valov and of

26  which he has personal knowledge.  See Valov Depo. 86-89.

### c) **Plaintiffs' Burden**

To survive summary judgment, Plaintiffs can proceed on one of two routes.  The first is to offer affirmative evidence that the agreement was in fact terminated and that UAP no longer had consent to enter.  Plaintiffs argue that the agreement between Plaintiffs and UAP was terminated when Mr. Danny Bilbrey, the "fieldman" of Mr. Valov, and Mr. Valov terminated their employment.  The deposition testimony of both Mr. Bilbrey and Mr. Valov supports this.  <u>See</u> Bilbrey Depo. 67:13; Valov Depo. 124:18-24.  The legal issues regarding whether either Mr. Valov or Mr. Bilbrey were agents of UAP and whether they could unilaterally terminate the oral agreement were not briefed by the parties and the Court will not consider them.[3]

The second route is to offer evidence that UAP exceeded the scope of its consent, thereby making the entry unauthorized.  Under the terms of the agreement negotiated by Mr. Steele, the scope of UAP's consent to enter the property could have been exceeded if 1) something other than rinsate was deposited into the tank, 2) materials were deposited someplace other than the tank, or 3) Mr. Bilbrey failed to monitor the rinsate going into the sump.

Plaintiffs' filings and discovery requests are focused

---

[3]  The Court notes that UAP's UMF No. 14, which is undisputed by Plaintiffs states only that no one at UAP was instructed to remove the tank "*after*" both men left UAP's employ.  Def.'s UMF No. 14 (emphasis added).  This fact does not establish whether UAP was ever instructed to remove the tank.

1   primarily on the first issue, although Plaintiffs do argue the

2   second issue as well.  See Doc. 62 at 9.  Because the second

3   issue provides a basis for the denial of summary adjudication,

4   the Court will not consider the first issue further.

5       As to the second issue, Mr. Valov testified that he has

6   witnessed UAP trucks dumping directly into the sump.  Valov Depo.

7   65:4-6 ("I know at one time I saw somebody dumping into that

8   pond, and it was UAP"); 108:3-6 ("We had a red UAP truck, and it

9   was backed up there, and it was backed up to the sump.  The tank

10  sat right here, and they were backed up right here with the two-

11  inch hose going into the sump").  Mr. Bilbrey likewise testified

12  that he is "pretty sure" he observed a UAP truck dumping directly

13  into the sump rather than the tank.  Bilbrey Depo. 63:1-3 ("There

14  was one time I was pretty sure he was going directly into the

15  sump and not into the tank").  Further, Mr. Barton testified at

16  his deposition that he had deposited materials directly into the

17  sump on occasion.  See Leverett Decl. Ex. 5, Barton Depo. 56,

18  66:18-67:17.[4]

19      It is apparent based on this evidence that there is a

20  triable issue of fact as to whether UAP exceeded the scope of its

21  consent, thereby committing a trespass.  This finding precludes

22  the entry of summary adjudication as to this issue.

23  ///

24  _____

25      [4] The Court notes that counsel for Plaintiffs has failed to
    comply with Local Rule 5-133(j) which requires that, upon the
    filing of any document making reference to a deposition, a copy of
26  the entire deposition shall be filed with the Court.

1          **2.  Damages**

2          UAP argues that even if it did enter Plaintiffs' property

3    without consent, summary judgment is still appropriate because

4    Plaintiffs cannot demonstrate damages.  UAP cites "5 Witkin,

5    Summary 9th (1990) Tort, § 590" for the proposition that a

6    plaintiff in a trespass action must show that it "suffered damage

7    proximately caused by the defendant."  Defs.' Mot. at 8.  The

8    Court can find no such support in either the hard copy or online

9    versions of Witkin.  As far as the Court can discern, section 590

10   relates to invasion of privacy.  The section on trespass to land

11   begins at section 604 and does not specifically state whether

12   damages are a necessary element of a claim for trespass to land.

13   See 5 Witkin, Summary of California Law § 604 (9th ed. 1988,

14   Supp. 2005).

15         In Intel, supra, 30 Cal. 4th at 1352, the California Supreme

16   Court, in discussing whether injunctive relief was appropriate in

17   a case involving trespass to chattels, stated that "damage to the

18   property is not an element of the cause of action" in the case of

19   trespass to real property.  Absent contrary authority, this

20   fairly recent decision is the current state of the law.

21   Accordingly, because demonstrating damages proximately caused by

22   UAP is not an element, an apparent lack of a genuine issue of

23   fact as to damages would not warrant summary adjudication.

24         Even if damages were an element, there is a genuine dispute

25   of material fact as to this issue.  UAP argues that in the course

26   of its investigation its expert, Dr. Rush, found no hazardous

                                    12

1   materials capable of damaging an almond orchard; that the DTSC

2   results likewise found no hazardous materials capable of the

3   damage complained of; that witnesses observed Simplot trucks

4   dumping directly into the sump; and that the subject orchard was

5   dying because it was old and in generally poor health.

6        That witnesses observed Simplot trucks dumping into the sump

7   does not absolve UAP of liability.  Under California's

8   alternative liability theory, if a plaintiff cannot identify

9   which of two or more defendants caused an injury, the burden

10  shifts to the defendant to demonstrate that they were not

11  responsible.  <u>Summers v. Tice</u>, 33 Cal. 2d 80, 86 (1948).  As

12  mentioned, UAP trucks were witnessed dumping materials directly

13  into the sump, and the fact that Simplot trucks were also

14  observed dumping does not demonstrate that UAP was not

15  responsible.

16       As to the DTSC test results, Plaintiffs point out that the

17  DTSC samples were taken nearly a year after the alleged incident

18  and are thus of limited value.  Mr. Fujitsubo acknowledged in his

19  deposition testimony that it is "very difficult" to determine

20  whether hazardous materials had ever been in the sump based on

21  the sample that was taken.  Fujitsubo Depo. 34:9-23.  Further,

22  Mr. Steele testified that by the time DTSC came to take samples,

23  the sump would have been flushed out "several hundred times."

24  Steele Depo. 171:3-10.  The weight to be given the DTSC test

25  results is a matter for a trier of fact at trial rather than the

26  Court on summary judgment.

1        The most significant factual issue for trial involves the

2   testimony of the parties' experts.  Dr. Dale Rush is UAP's expert

3   and avers that:

4        13.  In approximately April of 2001, shortly after UAP
         was informed of the alleged damage at the subject
5        orchard, UAP immediately responded by performing an
         investigation.  I personally participated in this
6        investigation at the subject orchard and subsequently
         visited the orchard numerous times thereafter.
7
         14.  As part of the initial investigation, water and
8        sediment samples were taken from the tank and/or tail
         water holding pond.  The analysis of these samples
9        confirmed the tank and pond contained only low levels
         of fertilizer residues and no other pesticides or
10       chemicals that are capable of damaging almond trees.

11       15.  During my visual inspection in approximately Aril
         of 2001, I observed that the subject orchard, including
12       the sections of the orchard that had not suffered any
         alleged damage, was in generally poor and dilapidated
13       condition.  I noted approximately 58 almond trees in
         the northeast corner were dead and 97 more trees
14       appeared to have 25% to 50% damages; the subject
         orchard had approximately 8,000 trees, and the orchard
15       was in overall severe decline largely due to age and
         neglect.  In addition, the orchard appeared to be over
16       20 years old and in need of replanting.

17  Rush Decl. ¶¶ 13-15.

18       In contrast, Mr. Valov, who is listed as an expert on

19  Plaintiffs' expert witness disclosure, see Doc. 73, avers, among

20  other things, that:

21       16.  In April of 2001, when the orchard in question was
         damaged, the orchard had already received its fall 2000
22       and spring 2001 nitrogen fertilizer applications.  By
         February, 2001 the maximum amount of fertilizer which
23       could safely be applied to the orchard without concern
         for causing tip burn or leaf burn had been applied.
24       When one observes tip burn or leaf burn on the trees
         the orchard has received a toxic amount of fertilizer
25       and the feeder roots of the trees have been affected.

26       17.  I personally inspected the orchard in question in

                                14

April of 2001 at the request of Mr. Steele, the orchard
manager.  I observed water coming out of the irrigation
valves.  The water coming out of the irrigation valves
was black in color and viscous and had an extremely
strong odor of rotten eggs, which indicates the
presence of sulfur.[5]  I observed that the vegetation in
the orchard that had come into contact with the
irrigation water was dead or dying.  Later, almost
daily visits during approximately a three week period,
I observed the trees starting to defoliate and some of
the trees dying or dead, and an increase in tip burn
and in some instances almost total leaf burn.

19.  Based upon the pattern of damage of the trees and
the damage and death of the vegetation in the orchard,
the only source of the damages was from the irrigation
water which came from the orchard reservoir. . . .

22. I have personally reviewed test results which
analyzed the orchard soil prior to April, 2001.  I have
also reviewed test results which analyzed the orchard's
soil after April, 2001.  The same laboratory performed
both of the composite soil analys[e]s.  Based upon the
comparison of the two composite soil analys[e]s, it is
evident that a significant reduction in ph levels in
the affected area of the orchard is evident, despite
the fact that between the time the two tests were
conducted the soil in the affected area had been
significantly supplemented with lime to raise the ph
levels.  The only logical explanation is that a
significant amount of some acidifying agent was applied
to the affected area.

Valov Decl. ¶¶ 16-22.  Mr. Valov concludes that, based upon his

"education, experience, personal knowledge of the cultural

practices on the subject orchard, [and] based upon the test

---

[5] UAP's objection to this statement as inconsistent with Mr.
Valov's prior deposition is overruled as the prior testimony does
not directly contradict Mr. Valov's statements.  To the extent they
can be deemed inconsistent, that issue goes to Mr. Valov's
credibility and is one for the trier of fact.  Also, Mr. Valov
stated that when he went out with Mr. Steele and "took a look and
smelled the ground and the <u>dark</u> whatever it was come out of the
sump came up here . . .."  Valov Depo. 132:25 - 133:1-3 (emphasis
added).

15

1  results from the tests taken prior to April, 2001 and after

2  April, 2001," the damage to the orchard was caused by nitrogen

3  toxicity and the addition of N-pH uric acid which killed the

4  feeder roots of the trees and created a low ph level in the soil

5  that allowed heavy metal levels to increase to toxic levels in

6  the trees.  Valov Decl. at 9-10.  Mr. Valov also refutes the

7  conclusions of Dr. Rush as follows:

8      I have reviewed the Declaration of Dale Rush.  First,
    Dale Rush makes no reference to the specific test

9      results even though the test results were conducted by
    him or for him and/or for UAP.  Second, Dale Rush has

10     not had the constant contact with the orchard while I
    have had constant contact and knowledge or the cultural

11     practices including soil amendments and crop nutrients
    on an almost daily basis for fifteen plus years.

12     Third, the orchard, though it was approximately twenty
    plus years old, was healthy and productive and was

13     maintained in a manner consistent with good agronomic
    practices and in an manner consistent with practices in

14     the area. . . .

15 Id. at 10.

16     UAP objects generally to Mr. Valov's declaration because it

17 relies on unauthenticated documents that are not before the

18 Court.  These objections are overruled.  As mentioned, Plaintiffs

19 proffer Mr. Valov as an expert witness.  Under Rule 703 of the

20 Federal Rules of Evidence, an expert may rely on inadmissible

21 evidence that is "of the type reasonably relied upon by experts

22 in the particular field in forming opinions or inferences on the

23 subject."  Fed. R. Evid. 703.  That the test results Mr. Valov

24 refers to are not before the Court does not alter the Court's

25 ability to consider Mr. Valov's statements.

26     The Court notes that neither party has submitted any test

16

results to the Court, but rather both parties have relied on their respective experts' interpretations of the supposed test results.  There are questions of fact regarding not only what tests were conducted and when but also on what those test results indicated.  While no one appears to dispute that the pH of the subject orchard was low, there are questions of fact as to what created the low pH, and whether it could have been the result of UAP's conduct.

Additionally, there is a dispute as to whether the subject orchard was dying due to old age and neglect, as Dr. Rush avers, or whether the damage was the result of chemicals and an older orchard may still be viable, as Mr. Valov avers.

Accordingly, while Plaintiffs need not demonstrate damages as an element of their claim to survive summary judgment, even if they were so required the record indicates that there are genuine issues of material fact as to whether the subject orchard sustained damage that could be properly attributed to UAP's conduct.  Summary adjudication on this issue is thus DENIED.

**IV.  Plaintiffs' Rule 56(f) Requests**

The Court is uncertain as to whether Plaintiffs, in submitting their substantive opposition to the motion for summary judgment, intended to withdraw their argument that further discovery warranted a denial of summary judgment.  This motion is governed by Rule 56(f) of the Federal Rules of Civil Procedure. Because the Court has determined that summary judgment is inappropriate even without this further discovery, this argument

1  is dismissed as moot.  This determination does not preclude

2  Plaintiffs from making appropriate discovery motions to the

3  magistrate.

4  **V.   Failure to Comply with Local Rules**

5      Plaintiffs failed to comply with several provisions of the

6  Local Rules of the Eastern District of California including

7  various subsections of Rules 5-133, 56-260 and 78-230.

8  Plaintiffs' counsel is ordered to obtain a copy of the Local

9  Rules and adhere to them in all further proceedings before this

10 Court.  Failure to do so may result in sanctions.

11     **ACCORDINGLY,** Defendant's motion for summary judgment is

12 hereby DENIED.

13

14 IT IS SO ORDERED.

15 Ia40ij**Dated:  May 6, 2005**              **/s/ Robert E. Coyle**

                                    UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22

23

24

25

26

18